**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LEON STREETER,

                                        Plaintiff,

         - v -                                                    Civ. No. 9:04-CV-495
                                                                        (TJM/RFT)

GLENN S. GOORD, DOCS Commissioner; MICHAEL
ALLARD, Superintendent of Franklin Correctional Facility;
GLENN CHAMPAGNE, Doctor; N. SMITH, Registered Nurse;
DUMAS, Registered Nurse; GERALD CAHILL, Medical Director,

                                        Defendants.

**APPEARANCES:**                                    **OF COUNSEL:**

LEON STREETER
Plaintiff, *Pro Se*
92-A-5083
Mohawk Correctional Facility
P.O. Box 8451
Rome, N.Y. 13442-8451

HON. ANDREW CUOMO                          JEFFREY M. DVORIN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Defendants Goord, Allard,
Champagne, Dumas, Smith, and Cahill
The Capitol
Albany, N.Y. 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

         *Pro se* Plaintiff Leon Streeter brings this civil action, pursuant to 42 U.S.C. § 1983, alleging

that Defendants Goord, Allard, Champagne, Dumas, Smith and Cahill were deliberately indifferent

towards his medical needs in violation of the Eighth Amendment. *See generally* Dkt. No. 1, Compl.,

First Cause of Action.  Defendants bring a Motion for Summary Judgment.  Dkt. Nos. 92 & 97.

Plaintiff opposes the Motion.  Dkt. No. 105.  For the following reasons, it is recommended that the

Motion for Summary Judgment be **granted**.

## I.  FACTS

Plaintiff suffers from sickle cell anemia, a serious disease affecting blood flow that can result

in pain, anemia, infection, damage to vital organs and cause death.[1]  Dkt. No. 92-17, Defs.' 7.1

Statement at ¶ 1.[2]  Plaintiff was transferred to Franklin Correctional Facility on July 9, 2001, from

Coxsackie Correctional Facility.  *Id.* at ¶ 5, Dkt. No. 105-2, Pl.'s 7.1 Statement at ¶ 5.  Prior to his

arrival at Franklin, Plaintiff had a port-a-cath surgically implanted in his right arm.  Defs.' 7.1

Statement at ¶ 2.  A port-a-cath consists of a reservoir compartment connected to a catheter that is

inserted into a major vein near the heart, allowing drugs to be administered intravenously by

injection into the port.  *Id.* at ¶ 3.  Port-a-caths can also be used for hydration from intravenous

fluids, blood transfusions, and pain management.  Pl.'s. 7.1 Statement at ¶ 3 (citing Dkt. No. 105, Ex.

C, Am. Resp. to Pl.'s Req. for Admis. at ¶ 124) (hereinafter "Defs.' Am. Resp.").  The type of

catheter implanted in Plaintiff is called  a "PICC line."  Defs.' 7.1 Statement at ¶ 3.  Sickle cell

anemia patients sometimes have port-a-caths implanted because weak blood flow can make it

difficult to locate a vein for placement of an intravenous line.  *Id.* at ¶ 4.

On July 10, 2001, one day after Plaintiff's arrival at Franklin, he was seen by Defendant Dr.

---

[1] As Defendants explain, "[s]ickle cell anemia is an inherited disease of the red blood cells.  The disease is caused by an abnormal type of hemoglobin, known as hemoglobin S.  Hemoglobin S reduces the amount of oxygen inside red blood cells, which causes the cells to harden and become sickle shaped.  The affected red blood cells can get lodged in blood vessels, decreasing blood flow."  Dkt. No. 92-17, Defs.' 7.1 Statement at ¶ 1.  Complications from this disease may cause pain that can lead to death. Dkt. No. 105-2, Pl.'s 7.1 Statement at ¶ 1, Ex. C, Defs.'Am. Resp. to Pl.'s Req. for Admis. at ¶ 104.

[2] We will not cite to both Plaintiff's and Defendants' 7.1 Statements when the Plaintiff has either agreed to or failed to contradict the Defendants' factual assertions.  *See* N.D.N.Y.L.R. 7.1 (a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.") (emphasis in original).

Champagne who had not been informed of the port-a-cath and did not have access to Plaintiff's complete medical chart as it had not yet arrived from Coxsackie. *Id*. at ¶ 7, n.1; Dkt. No. 92-3, Glen Champagne, M.D., Decl., dated Sept. 25, 2006, Ex. B., Ambulatory Health R. (AHR), at p. 6.[3]  On August 16, 2001, Nurse Lawrence[4] saw Plaintiff and recognized the port-a-cath in his right arm. Defs.' 7.1 Statement at ¶ 8.[5]  Lawrence further noticed the catheter was hard, an indication it might be clogged, and scheduled Plaintiff to be seen by a physician.  *Id*.  Complications such as clogging can arise if a port-a-cath is not flushed regularly.  *Id*. at ¶ 9.

The next day Dr. Champagne saw Plaintiff and ordered a 20 gauge Huber needle for flushing the port-a-cath; he further requested that instructions on the use and flushing of the port-a-cath be provided to the nursing staff, who were generally not familiar with port-a-caths.  *Id*. at ¶ 11.  Nurse Brue,[6] who was proficient in flushing port-a-caths, trained others including Nurse Lawrence.  Pl.'s 7.1 Statement at ¶ 27; Defs.' Am. Resp. at ¶ 153.  On August 22, Dr. Champagne directed that the port-a-cath not be flushed out of concern that flushing might cause clotted particles to break free and enter Plaintiff's bloodstream.  Defs.' 7.1 Statement at ¶¶ 13-14.  Dr. Champagne felt that the port-a-cath might need to be replaced, requiring a minor surgical procedure, and arranged for Plaintiff to see Dr. Dewell, a general surgeon at Alice Hyde Medical Center in Malone, New York (Alice

---

[3] Plaintiff asserts that Defendant Champagne did not read his chart upon admission, but the record shows that the complete chart did not arrive until July 17, 2001.  *See* AHR, entry, dated July 17, 2001, at p. 6.

[4] Nurse Lawrence, who is not a Defendant in this action, was assigned to Plaintiff upon his arrival at Franklin. Defs.' 7.1 Statement at ¶ 6.

[5] Plaintiff denies this claim, proffering further facts that are immaterial to this simple factual assertion which is supported in the record.  Pl.'s 7.1 Statement at ¶ 8; AHR, entry, dated Aug. 16, 2001, at p. 9.

[6] Nurse Brue is not a Defendant in this action.

Hyde). *Id*. at ¶¶ 14-15.[7]  On September 5, Dr. Dewell was able to flush the port-a-cath obviating the need to implant a replacement, and recommended that the port-a-cath be flushed on a monthly basis. Defs' 7.1 Statement at ¶ 17.

On October 2, 2001, Plaintiff refused to have his port-a-cath flushed by Nurse Caban,[8] which is documented in a signed "Refusal of Medical Examination and/or Treatment" form.  AHR at p. 290.  Plaintiff stated in this signed form: "I would freely except [sic] all treatment, however I have been met with all different attitudes that force me to be hesitant to all treatments this staff wishes to provide.  I request others to do treatments ex: Flushes.  I no longer trust these workers." *Id*. Although Nurse Caban was thoroughly proficient in flushing and accessing port-a-caths,[9] Plaintiff refused her assistance whereupon Defendant Nurse Smith was called to the emergency room, however, Plaintiff refused her attempt to flush the port-a-cath as well.  AHR, entry, dated Oct. 2, 2001, at p. 16; Defs.' 7.1. Statement at ¶ 21.[10]  On October 5, Plaintiff again refused to allow Nurse Caban to flush his port-a-cath.  Defs.' 7.1 Statement at ¶ 20: AHR, entry, dated Oct. 5, 2001, at p. 17.  Plaintiff's port-a-cath was eventually flushed on October 11, 2001, and again on November 5, 2001.  Defs.' 7.1 Statement at ¶¶ 23-24.  On December 6, 2001, Plaintiff again refused to have his port-a-cath flushed by Nurse Caban.  *Id*. at ¶ 25; AHR, entry, dated Dec. 6, 2001, at p. 25.  Plaintiff

---

[7] Plaintiff states that Dr. Champagne never tried to access the port-a-cath himself before scheduling the minor surgical procedure with Dr. Dewell, which may be true, but has no bearing on the veracity of the factual assertion made by the Defendants. Pl.'s 7.1 Statement at ¶ 14.

[8] Nurse Caban is not a Defendant in this action.

[9] Plaintiff denies that Nurse Caban was proficient in flushing the port-a-cath simply by making the conclusory statement: "Nurse Caban treated Plaintiff badly and was not proficient with the use and access of port-a-caths." Pl.'s 7.1 Statement at ¶¶ 21 & 18.

[10] In her AHR form, Nurse Smith states "This inmate presents with every encounter an attitude that causes a great deal of disturbance in the infirmary." AHR, entry, dated Oct. 2, 2001, at p. 16.

had his port-a-cath flushed on February 7, 2002, and again on March 13, 2002. Defs.' 7.1 Statement at ¶¶ 31-32.

On April 4, 2002, Plaintiff saw Nurse Brue on a sick call and requested to see a physician regarding medications for a sickle cell crisis[11] and to discuss his bathroom needs. *Id*. at ¶ 38. On April 7, Dr. Champagne renewed Plaintiff's medications, which included a standing order for Percocet, and further directed that Plaintiff's port-a-cath be flushed once a month. *Id*. at ¶ 40.[12] Plaintiff was admitted to the Franklin infirmary on April 18 after complaining he was in a sickle cell crisis and suffering pain. *Id*. at ¶ 41. Upon his admission, Dr. Cahill prescribed Percocet and Naproxen for his pain. *Id*. at ¶ 42. Dr. Cahill examined Plaintiff on April 19, noting that Plaintiff had no fever, his lungs were clear, his HEENT (head, eyes, ears, nose and throat), his cardiovascular reading and his abdomen were normal, and he appeared to be eating well. *Id*. at ¶ 45; AHR, Progress Notes, dated Apr. 19, 2002, at p. 76.[13] Dr. Cahill ordered that Plaintiff be given MS Contin, a morphine tablet, in addition to his Percocet. Defs.' 7.1 Statement at ¶ 46.

The following day Plaintiff vomited up his pain medications and his pain had not subsided. *Id*. at ¶ 53.[14] In response, Dr. Cahill had Plaintiff admitted to Alice Hyde for hydration and pain control. *Id*. at ¶ 54. Dr. Cahill administered a physical exam on April 21, noting that Plaintiff's blood analysis was "unremarkable" and normal for a sickle cell patient, as were his HEENT and

---

[11] A sickle cell crisis is a severe attack of the disease whose primary symptom is pain. Defs.' 7.1 Statement at ¶ 36.

[12] Plaintiff denies the facts alleged in ¶ 40 of the Defendants' 7.1 Statement, but the grounds for his denial are unintelligible. *See* Pl.'s 7.1 Statement at ¶ 40.

[13] Plaintiff denies this factual allegation by submitting that he was in great pain and was not eating well. *See*, Pl.'s 7.1 Statement at ¶ 45.

[14] Plaintiff denies this factual allegation without contradicting it. *See* Pl.'s 7.1 Statement at ¶ 53.

heart rate. AHR, Physical Examination Sheet, dated Apr. 22, 1999, at p. 207. While at Alice Hyde, Plaintiff was given IV hydration and placed on a morphine pump. Defs.' 7.1 Statement at ¶ 59. However, Dr. Cahill observed a potential kink in the port-a-cath line,[15] meaning that the port-a-cath could no longer be used for pain relief or hydration. AHR, Discharge Summary Report, dated Apr. 21, 2002, at p. 216. Dr. Cahill ordered that a surgery consultation be scheduled in order to have another port-a-cath surgically implanted. *Id*. In addition, Dr. Cahill directed Plaintiff be given oral medication for his pain: MS Contin, a controlled-release form of morphine providing a baseline of pain relief, and MSIR, a fast-acting form of morphine for additional pain relief when needed. Defs.' 7.1 Statement at ¶ 63.

Plaintiff was discharged from Alice Hyde to the Franklin infirmary on the evening of April 21, 2002. *Id*. at ¶ 66. On at least one occasion during his brief stay at Alice Hyde, Plaintiff vomited his food and medication. Am. Resp. at ¶ 225. Notwithstanding, Dr. Cahill noted Plaintiff was in less pain and his condition stabilized by the time of his discharge. AHR, Discharge Summary Report, dated Apr. 21, 2002, at p. 216.[16] Dr. Cahill examined Plaintiff on April 22, finding his condition stable, and noting Plaintiff's continued complaints of pain, and that his port-a-cath was not functional. AHR, Progress Notes, dated Apr. 22, 2002, at p. 78.

Dr. Kim[17] examined Plaintiff on April 23, noting that he was in a "painful crisis" and ordered continuation of his then-current medication regiment. AHR, Progress Notes, dated Apr. 23, 2002,

---

[15] In Dr. Cahill's Discharge Summary Report, he wrote that "[i]t was reported that the patient was manipulating the PICC line and we were unable to flush and draw blood from the line starting this morning." AHR, Discharge Summary Report, dated Apr. 21, 2002, at p. 216. Plaintiff denies that he tampered with the line, attributing its dysfunction to the incompetence of the medical staff. Pl.'s 7.1 Statement at ¶ 61.

[16] Plaintiff denies both that his condition was stable and that he was in less pain. Pl.'s 7.1 Statement at ¶ 66.

[17] Dr. Kim is not a Defendant is this action.

at p. 79.  On April 24, Plaintiff continued to complain of pain and asked for a dose of his medication before his scheduled time to receive it, and, after being refused by a nurse, asked to see a doctor. Defs.' 7.1 Statement at ¶ 76.  Over the next several days, the nursing staff gave Plaintiff his base pain medication (MS Contin), and his fast acting pain medication (MSIR) when he requested it. AHR, Progress Notes, dated Apr. 25-28, 2002, at pp. 80-82.  Notes taken by the nurses during these days indicate that Plaintiff exhibited signs of well-being such as healthy appetite, doing chores, shaving, and cleaning his room.  Defs.' 7.1 Statement at ¶¶ 78-80.

Nurse Brue was able to flush Plaintiff's port-a-cath on April 29, 2002, obviating the need for surgery.  *Id*. at ¶ 89.  Plaintiff complained of pain and requested more pain pills during a meeting with Dr. Kim on May 1, and again during a meeting with Dr. Cahill on May 2.  *Id*. at ¶¶ 91-92.  Dr. Cahill found Plaintiff's condition to be stable and indicated that he could be discharged and should continue to take the pain medications.  *Id*. at ¶ 93.  Plaintiff was discharged from the infirmary on May 2, 2002.

In Dr. Champagne's opinion, Plaintiff's overall physical condition including his sickle cell disease, did not deteriorate as a result of the sickle cell crisis he endured between April 18 and May 2, 2002.  *Id*. at ¶ 95.  However, blood tests conducted during the month of April evidence a decline in Plaintiff's blood count.   *Id*. at ¶¶ 96-98.  Plaintiff contends this decrease in blood count is evidence of a deterioration in his condition, necessitating two blood transfusions performed in July 2002.  Pl.'s 7.1 Statement at ¶ 95.  Defendants reply that such fluctuations in blood count are normal for sickle cell patients like Plaintiff, and that they "have no basis for determining what precisely caused the need for Plaintiff to have blood transfusions."  Defs.' 7.1 Statement at ¶ 99; Am. Resp. at ¶ 213.

Plaintiff had no problems with his medical care after his release from the infirmary on May 2, 2002.  Defs.' 7.1 Statement at ¶ 100.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed

allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B. Eighth Amendment Claims

Plaintiff alleges Defendants acted with deliberate indifference in treating his sickle cell anemia. Compl. at pp. 10-11. Specifically, Plaintiff contends that Defendants' inability to properly access and utilize his previously implanted port-a-cath for the purposes of hydration and pain relief caused him unnecessary and prolonged pain. *Id*. at ¶ 37. In addition, Plaintiff contends that Defendants took measures to "conceal their gross negligence." *Id*. at pp. 10-11.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong*, 143 F.3d at 702 & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

## 1. Eighth Amendment Claim against Dr. Cahill

Dr. Cahill and Dr. Champagne are the only Defendants whose names actually appear in the body of the Complaint. Plaintiff claims that Dr. Cahill is guilty of deliberate indifference towards his serious medical needs, specifically with respect to his alleged use, non-use, and misuse of the port-a-cath. Compl. at ¶¶ 33-37. Plaintiff states Dr. Cahill wrongly concluded that the port-a-cath was inaccessible and that it could not be used to administer hydrating fluids and pain medication, that Dr. Cahill scheduled him for an unnecessary surgical procedure to replace the port-a-cath (a procedure that never took place), and that Dr. Cahill wrongfully discharged him from Alice Hyde to the Franklin infirmary on April 21, 2002, and lied about his reason for doing so. *Id.*

A threshold issue is whether Plaintiff has suffered from a serious illness or injury under the objective prong of the Eighth Amendment analysis. *Smith v. Carpenter*, 316 F.3d at 184 (quoting

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (further citation omitted).  Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain."  *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

Dr. Cahill's treatment of Streeter began, for purposes of the current case, in April 2002 when Plaintiff was in a sickle cell crisis.  It is undeniable that sickle cell anemia itself can constitute a serious medical condition for the purpose of Eighth Amendment analysis. Dkt. No. 92, Defs.' Mem. of Law at p. 10.  Particularly with respect to the sickle cell crisis that Plaintiff appears to have endured during April 2002, the record reflects that reasonable doctors did in fact perceive Plaintiff's needs as important and worthy of treatment, and that Plaintiff experienced substantial pain during that period. *Brock v. Wright*, 315. F.3d at 162-63; AHR, Progress Notes, dated Apr. 23, 2002, at p. 7 (Dr. Kim noted Plaintiff was experiencing a "painful crisis" on April 23, 2002).  Therefore we find that Plaintiff meets the first prong of his Eighth Amendment claim by establishing that his sickle cell crisis was a serious medical condition.

Having determined that Plaintiff's medical condition during the sickle cell crisis was serious, we must now decide whether Defendant Cahill acted with deliberate indifference towards that condition.  Prison officials act with deliberate indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1970)).  Plaintiff alleges he unnecessarily suffered pain and dehyrdration during his crisis as a result of the non-use of the port-a-cath.  Compl. at ¶ 37.  Notwithstanding, Dr. Cahill prescribed pain medication for Plaintiff in the form of controlled-release and fast-acting morphine pills.  AHR, Health Provider Order Sheet, dated Apr. 19-21, 2002, at p. 248.

Assuming Plaintiff suffered more pain as a consequence of taking pain medication in pill form than he would have experienced had his port-a-cath been consistently used, there is still no evidence Dr. Cahill knowingly disregarded "an excessive risk" to Plaintiff's health or safety. *Chance v. Armstrong,* 143 F.3d at 702 (internal quotations and citations omitted).  To the contrary, Dr. Cahill recognized Plaintiff's serious and painful condition and prescribed pain medication in the form of Naproxen and Percocet initially, and then MS Contin and MSIR.  *See supra* Part I at pp. 5-6. The fact that Plaintiff did not prefer this form of treatment is inapposite since  "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim." *Ifill v. Goord*, 2004 WL 1663994, at *3 (W.D.N.Y. Apr. 8, 2004) (internal quotations and citations omitted).

Due to the potential adverse consequences, and based on his observation of a potential kink in the port-a-cath, Dr. Cahill ordered a surgery consultation for Plaintiff to have a new port-a-cath surgically implanted.  Surgery, however, was rendered unnecessary when Nurse Brue successfully flushed the port-a-cath.   *See supra* Part I at pp. 5-7.  Even assuming Dr. Cahill erred in his observation of the potential kink and therefore unnecessarily scheduled a consultation for Plaintiff,

*-12-*

such a minuscule misstep, when considered alongside his cautionary recommendation of a consultation and his prescription of oral pain medications in lieu of intravenous medication, would not likely rise to the level of negligent conduct, which itself does not afford grounds for relief under the Eighth Amendment. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 & n.14(1976)).

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the Eighth Amendment claim against Dr. Cahill.

### 2.  Eighth Amendment Claim against Dr. Champagne

Though Dr. Champagne's name appears in the Complaint, Plaintiff merely states that he did not know how to access the port-a-cath.  Compl. at ¶ 25.  Later at his deposition, Streeter provided specific allegations against Dr. Champagne which we now address.

Plaintiff's complaint against Dr. Champagne focuses on the use, non-use, and potential misuse of the port-a-cath.  *Id.*  Plaintiff asserts in his deposition that Dr. Champagne: (1) did not know how to access or flush his port-a-cath (Dkt. No. 92, Ex. A, Dep. of Leon Streeter, dated Nov. 3, 2005, at pp. 53-54); (2) scheduled him for an unnecessary surgical procedure to have his port-a-cath removed (which never happened) (*Id.* at p. 57; Compl. at ¶ 25); (3) did not implement procedures at Franklin regarding the use of the port-a-cath (Streeter Dep. at p.119); and (4) did not ensure that more than one member of his staff knew how to access the port-a-cath (*Id.* at p. 119).

Whereas Plaintiff's claims against Dr. Cahill focused on his treatment during his sickle cell crisis during the month of April 2002, his claims against Dr. Champagne largely concern his

*-13-*

treatment leading up to that crisis.  Dr. Champagne saw Plaintiff on July 10, 2001, soon after his arrival at Franklin, and then again on August 17, 2001, when he ordered a Huber needle for flushing the port-a-cath and requested that instructions on the use and flushing of the port-a-cath be provided to the nursing staff.  AHR, entry, dated Aug. 17, 2001, at p. 9.  On August 22, Dr. Champagne directed that the port-a-cath not be flushed out of concern that flushing might cause clotted particles to break free and enter Plaintiff's bloodstream.  AHR, entry, dated Aug. 22, 2001, at p. 10.  Dr. Champagne felt that the port-a-cath might need to be replaced and arranged for a surgery consultation.  AHR, entry, dated Aug. 24, 2001, at p. 11.  Dr. Dewell flushed the port-a-cath during that consultation, rendering the planned replacement surgery unnecessary. AHR, Consultation Form, dated Sept. 5, 2002, at p. 165.

Initially, we must determine whether Plaintiff had a serious medical need worthy of protection under the Eighth Amendment during Dr. Champagne's treatment of him.  As previously noted, sickle cell anemia can constitute a serious medical condition for Eighth Amendment purposes. However, Plaintiff does not allege that his condition deteriorated as a result of the treatment Dr. Champagne provided him.[18]  In this instance, Plaintiff merely alleges that Dr. Champagne did not know how to operate his port-a-cath and consequently inconvenienced Plaintiff by scheduling a consultation with Dr. Dewell and delaying the flushing of his port-a-cath.  Compl. at ¶ 25.  "[W]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone."  *Smith*

---

[18] Whereas in his claim against Dr. Cahill, Plaintiff alleges that the lack of use of the port-a-cath contributed to increased pain during his sickle cell crisis and a lowering of blood count levels requiring a blood transfusion.  *See* Part II.B.1, Eighth Amendment Claim against Dr. Cahill, at pp. 13-15.

*v. Carpenter*, 316 F.3d at 185 (emphasis in original).  In this case, said delay, with no consequential injury or deterioration, does not constitute a "serious medical need" under the Eighth Amendment.

Assuming, *arguendo*, that a serious medical condition was involved, Plaintiff could not establish that Dr. Champagne acted with deliberate indifference towards that need.  To the contrary, Dr. Champagne made efforts to utilize the port-a-cath by ordering the Huber needle, requesting instructions for his staff on how to flush the port-a-cath, and scheduling the consultation with Dr. Dewell specifically to examine the port-a-cath.  AHR, entry, dated Aug. 17, 2001, at p. 9.

Plaintiff also alleges that Dr. Champagne did not institute procedures at Franklin for the use of the port-a-cath and that an insufficient number of medical staff at Franklin were proficient in the use of the port-a-cath.  As stated above, Dr. Champagne ordered instructions for his staff on how to use and flush the port-a-cath.  *Id*.  The record shows that both Nurse Brue and Nurse Lawrence were able to successfully flush Plaintiff's port-a-cath.  AHR, entry dated Feb. 7, 2002, at p. 29; AHR, entry, dated Mar. 13, 2002, at p. 33.  Furthermore, Plaintiff refused Nurse Caban's attempts to flush his port-a-cath on several occasions.  AHR, entry, dated Oct. 5, 2001, at p. 17; AHR, entry, dated Dec. 16, 2001, at p. 25.  The record shows the medical staff at Franklin flushed or attempted to flush Plaintiff's port-a-cath on eight occasions between July 9, 2001 and May 2, 2002.  *See supra* Part I, Facts, at pp. 2-7.[19]  Although pursuant to Dr. Dewell's orders Plaintiff's port-a-cath should have been flushed on a monthly basis, there is no evidence that Dr. Champagne or his staff disregarded an "excessive risk" to Plaintiff's safety by failing to fully carry out that order.  AHR, Consultation Form, dated Sept. 5, 2001, at p. 165; *Farmer v. Brennan*, 511 U.S. at 837.

---

[19] The medical staff flushed or attempted to flush Plaintiff's port-a-cath on the following dates: October 2, 2001; October 5, 2001; October 11, 2001; November 5, 2001; December 6, 2001; February 7, 2002; March 13, 2002; April 29, 2002.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the Eighth Amendment claim against Dr. Champagne.

### C. Personal Involvement

With regard to the remaining Defendants – Goord, Allard, Smith, and Dumas – we note initially that Plaintiff's Complaint is devoid of any specific factual allegations against these Defendants. In fact, as we previously noted, only the names of Dr. Cahill and Dr. Champagne appear in the body of the Complaint. These other Defendants are named only in the caption. While Plaintiff provided testimony before trial extrapolating on his specific claims against each Defendant, at no time did Plaintiff attempt to amend his Complaint so that such allegations were properly interjected into the case. Thus, we must first assess to what extent each of the remaining Defendants was personally involved in any alleged constitutional violation. Despite Plaintiff's failure to follow the correct procedural rules regarding the amendment of pleadings, we will consider all the information provided in assessing the extent of these Defendants' personal involvement.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability

on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d at 873) (further citations omitted).

### 1. Eighth Amendment Claim against Commissioner Goord

Other than being named as a Defendant, Commissioner Goord does not appear in any of Plaintiff's allegations concerning the medical care he received while at Franklin.  In his deposition, Plaintiff indicated that he named Commissioner Goord as a Defendant because of his supervisory status over the medical departments, personnel, and the Deputy Commissioner, Dr. Lester Wright, who is not a named Defendant.  Streeter Dep. at pp. 115-117.  Plaintiff stated that while he wrote letters of complaint to Dr. Wright, he never wrote or otherwise tried to appraise Commissioner Goord of his situation.  *Id*. at p. 117.  There is no evidence Commissioner Goord was aware of the alleged constitutional violations that occurred, nor is there any evidence that he implemented or sanctioned policies or customs amounting to a constitutional violation.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the Eighth Amendment claim against Commissioner Goord.

### 2. Eighth Amendment Claim against Superintendent Michael Allard

Defendant Michael Allard served as Superintendent of Franklin Correctional Facility from June 2, 2003 until June 23, 2005.  Dkt. No. 97, Dep. of Carol Makowski, Assistant Dir. of Pers. for DOCS, dated Oct. 16, 2006.  Prior to his Franklin appointment, he served as First Deputy

*-17-*

Superintendent at Gowanda Correctional Facility from January 25, 2001 to June 2, 2003.  *Id*. Because all of the events relevant to Plaintiff's claims occurred between July 9, 2001, and May 2, 2002, there is no basis for any claim of personal involvement on the part of Michael Allard. Additionally, Plaintiff acknowledged in his deposition that he mistakenly attached Allard's name to the Complaint.  Streeter Dep. at p. 118.  It is therefore recommended that Defendant Allard's Motion for Summary Judgment be **granted**.

### 3.  Eighth Amendment Claims against Nurse Smith and Nurse Dumas

Plaintiff indicates in his Complaint that nurses at Franklin did not allow him to press the nurse call button and did not attend to him when he attempted to wave them down.  Compl. at ¶ 35. Beyond that general assertion, we again must look to his deposition for clarification of his claims against Nurses Smith and Dumas.

In his deposition, Streeter asserted that Nurse Smith failed to flush his port-a-cath on August 16, 2001, and that Nurse Dumas did not know how to flush the port-a-cath.  Streeter Dep. at pp. 48-50 & 122.  To the extent Plaintiff's claims are based on the nurses' inability to access and flush his port-a-cath, there are no facts plead indicating Plaintiff's condition deteriorated in any way as a result of any possible negligent use or non-use of the port-a-cath by any of the nurses.  Plaintiff does suggest in his complaint that his condition worsened during his sickle cell crisis as a result of the non-use of his port-a-cath, however, there is no indication that Nurse Smith or Nurse Dumas played a role in the non-use or misuse of the port-a-cath during that period,[20] nor are there any facts proffered that Plaintiff's condition deteriorated as a result of any non-use or misuse of the port-a-cath before the onset of the sickle cell crisis.  Nor does Plaintiff claim that the sickle cell crisis was

---

[20] The record suggests that Plaintiff did not get along with the nurses and that they considered him disruptive. *See, e.g., supra* nn. 9 & 10.

a result of the non-use or misuse of the port-a-cath, rather, he claims that his crisis would have been shorter and less painful had the port-a-cath been used during that time.  Compl. at p. 10.  Thus, Plaintiff has no cognizable claim against either nurse with respect to the port-a-cath.  *Smith v. Carpenter*, 316 F.3d at 186 (stating that the Eighth Amendment concerns "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.") (citations omitted).

Streeter also made statements in his deposition that Nurses Smith and Dumas mistreated him and did not provide him with adequate care.  Specifically, he alleged that Nurse Smith occasionally failed to attend to him when he tried to waive her down for pain medication and told him not to use the call button unless he was "close to death."  Streeter Dep. at pp. 48-50 & 100-01; Compl. at ¶¶ 24 & 35.  Regarding Nurse Dumas, Streeter stated she did not provide care for him, did not notify her supervisor about Plaintiff's medical problems, and wrongly endorsed a misbehavior report issued to Plaintiff for misusing the emergency call button.  *Id*. at pp. 121-22.

Plaintiff does not offer any evidence to support these conclusory allegations.  "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d at 525-26.  The record indicates that on April 19, 2002, Plaintiff was issued a misbehavior report for misusing the infirmary emergency call button and told that he should use the call button only for "emergencies or any drastic change in condition."[21]  AHR, Progress Notes, dated Apr. 19, 2002, at

---

[21] The Franklin infirmary rules state that the button should be "used for true emergencies only" and also provide that using the call button for "[a]nything other than true emergencies will result in a Misbehavior Report."  Defs.' 7.1 Statement at ¶ 50.  On the date Plaintiff received his Misbehavior Report, he vomited one time, which the nursing staff did not consider an emergency, noting that Plaintiff "appear[ed] comfortable" and was "sleeping at good intervals."  AHR, Progress Notes, dated Apr. 19, 2002, at p. 78.

*-19-*

p. 77.  Nurse Dumas did not issue the report, but signed it only as a witness.  Dkt. No. 92, Ex. A,

Inmate Misbehavior Rep., dated Apr. 19, 2002.  Furthermore, the record indicates that Plaintiff was

regularly given his prescribed medication and that he was seen on multiple occasions each day by

the nursing staff who monitored his progress and conversed with him about his condition.  AHR,

Progress Notes, dated Apr. 18, 2002 through May 2, 2002, at pp. 77-83 & 146-58; Treatment and

Medication Records, dated Apr. 18, 2002 through May 2, 2002, at pp. 146-58.  Finally, the record

indicates that Drs. Cahill and Kim were aware of Plaintiff's condition and attended to him on several

occasions during his stay at Franklin.  *See supra* Part I at pp. 6-7.  In sum, there is no basis to

conclude, after construing these claims in a light most favorable to Plaintiff, that either Nurse Smith

or Nurse Dumas knowingly disregarded a serious risk to Plaintiff's health in violation of the Eighth

Amendment.

     Therefore, it is recommended that he Motion for Summary Judgment be **granted** on the

Eighth Amendment claims against Nurses Smith and Dumas.

## III.  CONCLUSION

     For the reasons stated herein, it is hereby

     **RECOMMENDED**, that the Motion for Summary Judgment (Dkt. Nos. 92 & 97) be

**GRANTED**; and it is further

     **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon the parties to this action.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**<u>FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE</u>**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Date:   September 17, 2007
        Albany, N.Y.

_____
RANDOLPH F. TREECE
United States Magistrate Judge